# EXHIBIT A

Electronically Filed by Superior Court of California, County of Orange, 12/21/2021 03:29:00 PM.
30-2021-01236706-CU-OE-NJC - ROA # 10 - DAVID H. YAMASAKI, Clerk of the Court By Arlene Gill, Deputy Clerk. **SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
 U.S. BANK NATIONAL ASSOCIATION, a Delaware corporation;
 U.S. BANCORP INVESTMENTS, INC., a Delaware corporation; and DOES 1-10, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

 GREGORY J. ANDREWS, an individual

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

   You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

   *Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

   *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Judge Craig Griffin
Superior Court Of California County Of Orange – North Justice Center
1275 N. Berkeley Avenue, Fullerton, California 92832-1258

CASE NUMBER: *(Número del Caso):*
30-2021-01236706-CU-OE-NJC

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):* Nathan M. Smith, BROWN, NERI, SMITH & KHAN LLP, 11601 Wilshire Boulevard, Suite 2080, Los Angeles, CA 90025; (310) 593-9890; Andrew M. Purdy, ANDREW M. PURDY, ATTORNEY AT LAW, 15615 Alton Parkway, Suite 450, Irvine, CA 92618; (949) 570-5500.(See additional counsel on Attachment to SUM-100)

DATE:
*(Fecha)* 12/21/2021  DAVID H. YAMASAKI, Clerk of the Court

Clerk, by
*(Secretario)* Arlene Gill , Deputy
*(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]



**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)   ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100  [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

Electronically Filed by Superior Court of California, County of Orange, 12/15/2021 04:43:49 PM.
30-2021-01236706-CU-OE-NJC - ROA # 2 - DAVID H. YAMASAKI, Clerk of the Court By Katie Trent, Deputy Clerk.

Nathan M. Smith (CA Bar No. 255212)
nate@bnsklaw.com
**BROWN, NERI, SMITH & KHAN LLP**
11601 Wilshire Boulevard, Suite 2080
Los Angeles, CA 90025
Tel: (310) 593-9890
Fax: (310) 593-9980

Andrew M. Purdy (CA Bar No. 261912)
amp@purdylegal.com
**ANDREW M. PURDY, ATTORNEY AT LAW**
15615 Alton Parkway, Suite 450
Irvine, CA 92618
Tel: (949) 570-5500
Fax: (949) 298-7234

Liam O'Brien (*pro hac vice forthcoming*)
lobrien@mcoblaw.com
**MCCORMICK & O'BRIEN, LLP**
9 East 40th Street, Fourth Floor
New York, NY 10016
Tel: (212) 320-8972
Fax: (212) 504-9574

Attorneys for Plaintiff
Gregory J. Andrews

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### COUNTY OF ORANGE – CENTRAL JUSTICE CENTER

North   K.T.

Assigned for All Purposes

Judge Craig Griffin

| | |
|---|---|
| GREGORY J. ANDREWS, an individual, | Case No. |
| | 30-2021-01236706-CU-OE-NJC |
| Plaintiff, | |
| | **COMPLAINT FOR:** |
| v. | |
| | 1. **DISABILITY DISCRIMINATION IN VIOLATION OF THE CALIFORNIA FEHA;** |
| U.S. BANK NATIONAL ASSOCIATION, a Delaware corporation; U.S. BANCORP INVESTMENTS, INC., a Delaware corporation; and DOES 1-10, inclusive, | 2. **FAILURE TO ACCOMMODATE DISABILITY;** |
| | 3. **FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS TO ACCOMMODATE DISABILITY;** |
| Defendants. | 4. **WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY;** |
| | 5. **VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200;** |
| | 6. **VIOLATION OF CALIFORNIA LABOR CODE SECTION 1198.5** |
| | |
| | **JURY TRIAL DEMANDED** |

Plaintiff Gregory J. Andrews (hereinafter "Plaintiff"or "Mr. Andrews") brings this action as an individual against U.S. BANK NATIONAL ASSOCIATION, a Delaware corporation (hereinafter "USBN" or "COMPANY"), U.S. BANCORP INVESTMENTS, INC., a Delaware corporation (hereinafter "USBI" or "Bancorp"), and Does 1 through 10, inclusive, (USBI, USBN, Bancorp, and/or Does 1 through 10 are hereinafter collectively referred to as "Defendants"). Plaintiff complains and alleges as follows on the basis of personal knowledge and/or information and belief:

## SUMMARY OF THE COMPLAINT

1.    Plaintiff Gregory J. Andrews was an outstanding performer as a Managing Director for U.S. Bank's private wealth management group. It is a testament to Mr. Andrews's professionalism that he was able to excel at this demanding job while living with Tourette's Syndrome.

2.    Mr. Andrews was by far the most successful Managing Director in his group. In the fall of 2019, Mr. Andrews was within months of earning over $650,000 in commissions on transactions he sourced, with additional lucrative deals (and sizeable commissions) in his personal deal pipeline.

3.    Despite all the business Mr. Andrews was bringing to his group, his supervisor decided to push Mr. Andrews out in a shortsighted attempt to take over his business. First, Mr. Andrews's supervisor stripped him of the support staff needed to do his job. Second, Mr. Andrews's supervisor humiliated him by forcing him to announce the change in staffing to his former team. Third, after Mr. Andrews had a brief, heated exchange with a colleague, the U.S. Bank used that interaction and Mr. Andrews's Tourette's Syndrome as an excuse to terminate him.

4.    Defendants violated California law by wrongfully terminating Mr. Andrews on the basis of disability; by failing to provide Mr. Andrews with an accommodation for his known disability; by failing to engage in an interactive process with him; and by failing to prevent discrimination toward him.

## THE PARTIES

5.    Plaintiff Gregory J. Andrews is a securities professional with decades of experience in investment banking. Mr. Andrews is a Certified Public Accountant, has an MBA from UCLA's prestigious Anderson School of Management, and holds a FINRA Series 79 investment banking registered representative license. Mr. Andrews started working for Defendant U.S. Bank in June 2017

as a Managing Director. After the bank amended its charter to offer merger and acquisition advisory services, Mr. Andrews, still an employee of U.S. Bank, began working at its wholly owned FINRA-registered broker-dealer, Defendant USBI, in or about August 2018. At the time of his termination, Mr. Andrews was a Managing Director, Business Owners Advisory Services ("BOAS"), at USBI, though his salary was paid by U.S. Bank. Mr. Andrews has resided in Orange County at all times relevant to this action.

6.      Defendant U.S. Bank National Association is a Delaware corporation with its principle place of business located in Minneapolis, Minnesota. U.S. Bank is qualified to do business within the State of California and conducted business in the state at all times relevant to this action. U.S. Bank is a subsidiary of  U.S. Bancorp, the fifth largest bank holding company in the United States. At all times relevant to this action, U.S. Bank employed more than five employees in the State of California.

7.      Defendant U.S. Bancorp Investments, Inc. is a Delaware corporation with its principal place of business located in Minneapolis, Minnesota. USBI is qualified to do business within the State of California and conducted business within the state at all times relevant to this action. Like U.S. Bank, USBI is a subsidiary of U.S. Bancorp. At all times relevant to this action, USBI employed more than five employees in the State of California.

8.      Roderick N. Dolan was Mr. Andrews's manager at USBI and the National Director of the bank's Business Owner Advisory Services group. Mr. Dolan has a FINRA Series 24 license and was the registered principal designated to supervise Mr. Andrews while he worked as a Managing Director for USBI. Upon information and belief, Mr. Dolan's primary place of business was in the State of Minnesota at all times relevant to this action, and he has resided in the State of Minnesota at all times relevant to this action.

9.      The true names and capacities of the defendants sued as Does 1-10 are presently unknown to Plaintiff, who, therefore, sues these defendants by fictitious names. Plaintiff is informed and believes, and on that basis alleges, that each fictitiously named defendant is responsible, in some manner, for the acts and omissions alleged herein. Plaintiff will seek leave of the Court to amend this complaint to set forth the names and capacities of each fictitiously named defendant after they have been ascertained.

## JURISDICTION AND VENUE

10.     The Court has jurisdiction over this matter because it arises under the laws of the State of California.

11.     Plaintiff Mr. Andrews filed his charge of discrimination with the California Department of Fair Employment and Housing on December 15, 2021. He received his notice of right to sue the same day.

12.     Venue is proper because the acts and events in the complaint occurred entirely within Orange County; Mr. Dolan directly supervised Mr. Andrews and others in the BOAS group based in USBI's Orange County Office; and both U.S. Bank and USBI maintain substantial offices and operations in Orange County.

## FACTS COMMON TO ALL CAUSES OF ACTION

### *Mr. Andrews Suffers from Tourette's Syndrome.*

13.     For over 55 years, Mr. Andrews has suffered from a neurological disorder called Tourette's Syndrome.

14.     Tourette's Syndrome is a neurological disorder characterized by rapid, repetitive, and involuntary muscle movements and vocalizations called "tics," and often involves behavioral difficulties. The term "involuntary," used to describe tics, is often a source of confusion since it is known that most people with Tourette's do have some control over their symptoms. What is often not recognized is that the control which can be exerted, from seconds to hours at a time, only delays more severe outbursts of symptoms.

15.     Tics are experienced as a build-up of tension, are irresistible and eventually must be performed. Typically, tics increase as a result of tension or stress and decrease with relaxation or concentration on an absorbing task. Tourette's symptoms have long been misconstrued as a sign of behavioral abnormality or nervous habits, which they are not. The variety and complexity of tics or tic-like symptoms exhibited by people living with Tourette's is enormous. People living with Tourette's rarely have all of these symptoms. Most people will exhibit some or many symptoms over a long period of time and in varying degrees: mild, moderate, or severe. In milder cases, a person may have just a few tics or twitches, which may be confined to the face, eye, and shoulder areas. In more severe cases,

several areas of the body may be affected. The symptoms wax and wane, in some cases from day to day but more commonly over three-to-four-month periods. The waxing and waning pattern can sometimes be frightening to people with Tourette's who may find it difficult to understand the sudden intensification or waning of symptoms.

16.     People living with Tourette's may frequently suffer from behavioral problems in addition to tics. These behavioral problems may include compulsive and repetitive behaviors, attention problems, sleep difficulties, depression, poor self-esteem, social phobia, oppositional/defiant behavior, and aggressive and uncooperative behaviors.

17.     People living with Tourette's may also suffer from Obsessive Compulsive Disorder and Attention Deficient and/or Hyperactivity Disorder.

18.     Absent treatment, Tourette's limits or makes more difficult a number of life activities, including work, sleep, and social relationships. With treatment, people living with Tourette's are able to lead productive and fulfilling lives.

19.     For Mr. Andrews, his Tourette's symptoms manifest in noticeable motor tics, such as involuntary (and sometimes contextually inappropriate) smiles or grimaces, neck twitches, and the sudden snapping of his wrists.

20.     During his employment at USBI, Mr. Andrews was under the care of a physician and managed the severity of his Tourette's condition with several regularly prescribed medications. Absent that treatment, Mr. Andrews would not have been able to perform the job requirements of a Managing Director or other comparable roles. Furthermore, absent treatment, Mr. Andrews's life activities would have been limited or made more difficult, including working, sleeping, and maintaining social relationships.

21.     Even with medication and treatment, Mr. Andrews's tics would sometimes occur when he was at work and in the presence of his colleagues. His tics, however, never interfered with the performance of his everyday duties as a Managing Director.

22.     The demands of Mr. Andrews's job, however, did from time to time make it challenging to manage his Tourette's symptoms. For example, the unpredictable nature of business travel at times made it difficult for him to take his medications on time with adequate food. Similarly, the long hours

and resulting irregular rest periods caused by ever-changing work demands at times made it difficult Mr. Andrews to manage his symptoms.

23.     The workplace stresses Mr. Andrews complains of below exacerbated his condition throughout his entire period of employment with USBI. Indeed, these stresses caused him to seek out stronger treatments and medications to keep his tics at bay and his psychological health in order.

*Mr. Andrews Was One of USBI's Most Successful Investment Bankers Until USBI Cut Him Off from the Support Staff Necessary to Do His Job.*

24.     Between August 2018 and December 2019, Mr. Andrews worked as one of the five managing directors in USBI's Business Owner Advisory Services group.

25.     BOAS, as part of U.S. Bank's wealth management division, assists business owners with identifying strategic business investment opportunities, business consulting services, and advising on business combination strategies (*i.e.*, mergers, acquisitions).

26.     When Mr. Andrews began at U.S. Bank, he interviewed for the BOAS manager position that ultimately was filled by Mr. Dolan. At that time, BOAS was a completely new business group at USBI. Though Mr. Andrews was more than qualified to run BOAS, he chose instead to take a managing director role so that he could take advantage of his many business relationships and connections to grow the group's deal portfolio and reputation.

27.     During Mr. Andrews's time as a BOAS Managing Director, he led the group in deal generation and closings. Many of the deals that Mr. Andrews brought to USBI came from his professional contacts and they were more interested in working with Mr. Andrews than USBI.

28.     At the time of Mr. Andrews's termination, he was a leading producer for USBI and was working eight active engagements that were in various stages of development. He stood to earn more than $650,000 in combined commissions on those engagements. Mr. Andrews was, to his knowledge, the highest paid and most productive Managing Director on the team.

29.     On October 29, 2019, Mr. Andrews conducted a seminar in Sacramento on business transitions that introduced business owners looking to sell their businesses to Mr. Andrews and USBI. The presentation was wildly successful, with seven of the thirteen companies participating asking for follow-up information.

30.     Following the Sacramento seminar, Mr. Andrews met with his manager, Mr. Dolan, in U.S. Bank's Sacramento office to discuss his 2019 performance review.

31.     At the meeting, without any prior warning, Mr. Dolan told Mr. Andrews that he needed to spend less time working on his client engagements, though Mr. Dolan still wanted Mr. Andrews to close deals and earn USBI its full fees. Further, Mr. Andrews was no longer be permitted to use the BOAS support staff resources available to him on his engagements. Mr. Dolan said he was to take over the supervision of the BOAS, and he would redirect the staff's resources to other work.

32.     Mr. Dolan's proposal simply did not make sense to Mr. Andrews. At that time, Mr. Andrews was running seven active sell-side engagements and one buy-side engagement—the largest number of transactions in the BOAS group by far. Mr. Andrews knew he needed all the support staff he could get to continue to successfully manage these engagements. Mr. Andrews could not possibly work and close all eight engagements without support resources. Further, to reassign support staff to other group members with few to no active engagements was, in Mr. Andrews's opinion, a waste of the group's resources.

33.     During this meeting, Mr. Dolan also told Mr. Andrews in passing that USBI changed the terms of employee's compensation plan. Mr. Dolan stated that UBSI would no longer pay post-separation compensation to managing directors for deals that closed after the managing director had left USBI. Mr. Dolan did not state that the new policy applied to existing engagements that Mr. Andrews sourced and worked. Mr. Andrews, however, was not sure that this change applied to him because he was hired by U.S. Bank and at no time after he started at USBI was he asked to sign a registered representative agreement.

34.     At no time during this meeting did Mr. Dolan convey to Mr. Andrews that he was at risk of termination. Rather, Mr. Dolan's review of Mr. Andrews was overall a positive one.

35.     At the conclusion of his meeting with Mr. Dolan, Mr. Andrews expressed concern over the changes in support staff use and the impact it would have on his ability to complete time-sensitive tasks related to the deals he was trying to close at that time. Mr. Dolan did not offer any solutions, alternatives or even sympathy. Instead,  Dolan instructed Mr. Andrews to tell his former staff that they now reported to directly to Dolan. When Mr. Andrews protested that the message would be better

COMPLAINT FOR DAMAGES

7

understood if it came from Dolan, Dolan refused to reconsider.

### *Mr. Andrews Met with his Staff as Mr. Dolan Instructed.*

36.     On October 30, 2019, Mr. Andrews woke up at 4:30 AM in Sacramento with a plan to fly to Orange County to attend an important lunch conference about business and then drive to Newport Beach to meet with his former staff at approximately 2:00 PM. Even after a flight delay and two missed meals, Mr. Andrews was still able to make it to Newport Beach for the staff meeting at 2:00 PM. At the outset of the meeting, Mr. Andrews told everyone that he had a very rough night, was unable to sleep in his hotel, had to wake up early to catch an early flight that was canceled and had no time to eat, so he was unable to take the anti-convulsive and anti-anxiety medications necessary to manage his Tourette's.

37.     Mr. Andrews explained to the BOAS staff that Mr. Dolan had changed the group's work rules and its expectations of employees, and that that they would be reporting directly to Mr. Dolan going forward. The staff reacted poorly to this change in reporting structure.

38.     As the meeting was winding down, Mr. Andrews confronted one of the BOAS staff members on what he believed was the staff member's undermining of his efforts to source a new engagement by raising concerns about the engagement with Mr. Dolan behind Mr. Andrews's back. Mr. Dolan, who had not been briefed by Mr. Andrews about this new engagement, had raised the engagement with Mr. Andrews and expressed a negative view of it. Mr. Andrews believed that the staff member was the only BOAS staffer that would have discussed the engagement with Mr. Dolan. The staff member denied Mr. Andrews's accusation. Mr. Andrews refused to accept his denial and accused him of being dishonest in an elevated voice. The entire dispute lasted roughly a minute. The meeting ended soon thereafter.

### *Despite USBI's Awareness of Mr. Andrews's Condition, The Company Terminates Him.*

39.     Prior to the October 30, 2019 meeting in Newport Beach, at least one BOAS staff member was aware that Mr. Andrews suffered from Tourette's Syndrome. On one occasion, Mr. Andrews mislaid his medication on his desk.  A BOAS staff member, Vice President Edgars Gulbis noticed the medication and questioned Mr. Andrews about it.  Mr. Andrews explained his illness and his need for the medication to Mr. Gulbris. Others in the office would also have been aware of Mr. Andrews facial and body ticks that are associated with Tourette's Syndrome.

40. On November 1, 2019, Mr. Andrews was contacted by USBI's Human Resources Department and told that USBI was investigating a complaint made regarding Mr. Andrews's conduct at the October 30 meeting. At USBI's request, Mr. Andrews gave a telephone interview regarding the October 30 staff meeting. At the conclusion of this discussion, UBSI's Human Resources advised Mr. Andrews to work from home until further notice and to avoid contact with the staff person he confronted at the staff meeting.

41. Much later after his termination, Mr. Andrews learned that the person who reported him to Human Resources and thereby precipitated the investigation was the BOAS staff member that Mr. Andrews had called out, and he only reported Mr. Andrews because he was embarrassed that Mr. Andrews called him out in front of his other BOAS colleagues. Mr. Andrews and the staff member have subsequently resolved their differences.

42. On November 6, 2019, Mr. Andrews had a call with Mr. Dolan to review the status of his active engagements in advance of departing for a much-needed vacation. The call was cordial and Mr. Dolan did not raise any issues pertaining to the October 30, 2019 meeting or the Human Resources investigation related to it. In fact, Mr. Dolan told Mr. Andrews that the investigation would probably go away.

43. On November 12, 2020, Mr. Dolan advised the Governance Committee for BOAS, a committee in which Mr. Andrews was a voting member, that Mr. Andrews would be transitioning to a non-voting member due to his busy workload. Mr. Andrews requested this change in his status as a Governance Committee because, at the time, Mr. Andrews had worked 16 weeks straight with only three days off.

44. On November 26, 2020, Mr. Andrews participated in an approximately 90-minute call with an investigator for USBI's Human Resources Department. During the call, Mr. Andrews gave the investigator some color on his recent performance review and how he had been impacted by the stress brought on by having worked 16 weeks with only three days off. Mr. Andrews also discussed the circumstances that led up to the October 30, 2019 staff incident and the same conditions which he had informed the staff of at the outset of that meeting, *i.e.*, Mr. Andrews's insomnia, his inability to eat, and his inability to take his regular medications. Mr. Andrews told the investigator what specific medicines

he was prescribed and what they were intended to treat. The Human Resources investigator made no comments in response to Mr. Andrews's recitation of these background facts, nor did the investigator ask any questions about Mr. Andrews's health, his condition, or medications.

45.     On December 6, 2019, Mr. Andrews received an email from Mr. Dolan asking when one of his pending deals—"Project Spine"—was expected to close. At that time, the closing was set to occur on December 30, 2019. Mr. Andrews responded and told him the expected closing date. Mr. Andrews expected USBI to make $175,000 in gross fees on "Project Spine," and he expected to make a commission equal to 45% of the bank's fees.

46.     On December 16, 2019, Mr. Andrews participated in a call with the Human Resources investigator, his supervisor, Mr. Dolan, and Ms. Debby Gabris, a Senior Human Resources Business Partner at USBI to discuss the October 30, 2019 staff incident. Again, Mr. Andrews reviewed the circumstances that led to his outburst at the staff meeting, including his insomnia and his inability to eat, which resulted in his not being able to take his medications, and the fact that he suffers from Tourette's Syndrome. Mr. Andrews also told the call participants that he had been suffering from high blood pressure since the October 30 staff incident and USBI's requirement that he stay away from the office to avoid the staff member he confronted. Mr. Andrews suggested that perhaps he should consider going on short-term disability. None of the call participants responded to his statement.

47.     During the same call, the Human Resources investigator notified Mr. Andrews that she had spoken to other individuals about his past "aggressive" behavior. The investigator, however, would not disclose to whom she had spoken to due to "confidentiality," nor would she describe to him any of these purported past aggressive actions.

48.     Mr. Andrews had no opportunity to respond to these purported allegations. This was very frustrating to him. At no time in his long career as a securities professional had anyone ever accused Mr. Andrews of being aggressive.

49.     At the end of the call, USBI terminated Mr. Andrews employment effective immediately.

50.     USBI terminated Mr. Andrews without any effort to engage in an interactive process to seek a reasonable accommodation for his disability as required under California law.

***USBI Used Mr. Andrews's Disability as an Excuse to Terminate Him and Avoid Paying Him the***
***Commissions Due Him.***

51.     As a Managing Director, most of Mr. Andrews's compensation came from commissions he earned on transactions he sourced, managed and closed. At the time USBI terminated Mr. Andrews, he was at the cusp of realizing the fruits of two years of labor on at least six deals for which he would earn substantial commissions.

52.     Based on his plan and his understanding of those deals and their terms, Mr. Andrews reasonably expected to receive at approximately $650,000 in commissions from those deals. To Mr. Andrews's knowledge, no one else in the BOAS group, including Dolan, was on track to receive commissions anywhere close to that level.

53.     Mr. Andrews is informed and believes based on publicly available information that the first of his six transactions—known as "Project Spine" internally—closed within six weeks of his termination. USBI's commission structure allotted Mr. Andrews 45% of the $175,000 commission on that transaction. Mr. Andrews is also informed and believes based on publicly available information that at least four of the remaining transactions have since closed. Had Mr. Andrews not been terminated, it is likely that all the transactions he was working on would have closed. Together, the transactions sourced and worked by Mr. Andrews likely generated fees and commissions for USBI and the BOAS group in excess of $2,000,000.

54.     Because Mr. Andrews was not paid any of the commissions due him, that money likely was distributed among Mr. Dolan (who would get a bonus based on the overall P&L statement of the group) and the remaining BOAS staff members.

55.     Further, had Mr. Andrews not been terminated, it is very likely that the multiple leads he generated as a direct result of his Sacramento BOAS seminar would have resulted in engagements likely to yield millions of dollars in fees for USBI and hundreds of thousands of dollars in commissions for Mr. Andrews.

***USBI Refused to Provide Mr. Andrews With Complete Copies of His Personnel File.***

56.     Within two or three days following his termination on December 16, 2021, Mr. Andrews made a formal request to USBI's Human Resources Department for a copy of his personnel file. He

COMPLAINT FOR DAMAGES

also voluntarily provided Human Resources with information regarding the medications he was taking at the time of the October 30 staff incident. Notably, no one from USBI requested any information about Mr. Andrews's medical condition or his then-current course of treatment prior to or even after his termination.

57.     On December 30, 2019, Mr. Andrews received from USBI only a partial copy of his personnel file. The copy did not contain copies of any of his performance reviews, grievances against him (in violation of California law) or conduct/rule violations. Instead, the files provided consisted of little more than Mr. Andrews's employment onboarding forms from 2017. After informing USBI that the files they provided him were grossly insufficient, USBI Human Resources provided him with a copy of his 2018 performance review, but not his 2019 one. USBI never provided Mr. Andrews with the grievances against him, records regarding his purported aggressive behavior, or his termination. Notably, USBI's employment file for Mr. Andrews included no mention of his disability, even though he had raised that issue in each of his conversations with the company's Human Resources team.

58.     Mr. Andrews also requested from USBI copies of his BOAS compensation agreement, including all amendments thereto. He received a response from USBI's Human Resources Department stating that "they would check with USB [*i.e.*, U.S. Bank] legal department." Mr. Andrews never received a follow-up response and to date the company has failed to produce to him his compensation agreement.

### ***USBI Refused to Privately Arbitrate this Dispute.***

59.     USBI, as a FINRA member, and Mr. Andrews, a registered advisor with FINRA, have an available arbitration forum to resolve this dispute. Where, however, there are allegations of discrimination, both parties must consent to arbitrate.

60.     On February 16, 2021, Mr. Andrews, through his counsel, requested that USBI agree to arbitrate this dispute. On February 26, 2021, USBI notified Mr. Andrews that it would not agree to arbitration. This lawsuit follows.

## **FIRST CAUSE OF ACTION**

### **Disability Discrimination in Violation of the California Fair Employment and Housing Act**

### **(Against all Defendants)**

61.     Plaintiff realleges and incorporates by reference paragraphs 1 through 60 as if fully alleged herein.

62.     At all times relevant to his claims herein, Mr. Andrews suffered—and continues to suffer—from a disability that limits major life activities unless accommodated, including Tourette's Syndrome.

63.     USBI and Mr. Dolan were aware that Mr. Andrews suffered from Tourette's Syndrome.

64.     USBI and Mr. Dolan were aware of the severity of Mr. Andrews's condition and its impact on his major life activities.

65.     USBI and Mr. Dolan discriminated against Mr. Andrews because of his disability by directing him to work remotely and with limited resources while he was at his busiest, and by disregarding his condition and its impact on his major life activities by summarily terminating his employment with the company.

66.     Additionally, Defendants used Mr. Andrews's disability as an excuse to terminate him. For example, USBI made no effort to determine if Mr. Andrews disability-related conduct was likely to repeat and USBI never asked whether it could accommodate Mr. Andrews's disability. Instead, Mr. Andrews's was terminated for conduct caused by his disability.

67.     Even worse, Mr. Andrews's conduct was no different than that of other Managing Directors at USBI. Loud arguments and accusations, provided they did not constitute discrimination or harassment based on a protected status, were not unusual in Dolan's group. Mr. Andrews was not the first managing director to raise their voice at a subordinate – but he is likely the first managing director purportedly fired for it.

68.     As a result of Defendants' discrimination against Mr. Andrews, he has suffered lost income, benefits, and bonuses, as well as severe emotional distress, mental anguish and physical injury, all in sums according to proof at trial.

69.     Defendants' conduct was oppressive, malicious, and fraudulent, and Mr. Andrews is

entitled to an award of punitive damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### Failure to Provide Accommodations in Violation of California's Fair Employment and Housing Act

### (Against All Defendants)

70.     Plaintiff realleges and incorporates by reference paragraphs 1 through 69 as if fully alleged herein.

71.     In California, an employer has an affirmative duty to make reasonable accommodations for the disability of any employee if the employer knows of the disability, even if the employee has not requested any accommodation.

72.     When Defendants became aware of Mr. Andrews's disability during the course of the investigative process, they were under a duty to take affirmative steps to offer him an accommodation.

73.     As a result of Defendants' failure to provide Mr. Andrews a reasonable accommodation, he has suffered lost income, benefits, and bonuses, as well as severe emotional distress, mental anguish and physical injury, all in sums according to proof at trial.

74.     Defendants' conduct was oppressive, malicious, and fraudulent, and Mr. Andrews is entitled to an award of punitive damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

### Failure to Engage in an Interactive Process Violation of California's Fair Employment and Housing Act

### (Against All Defendants)

75.     Plaintiff realleges and incorporates by reference paragraphs 1 through 74 as if fully alleged herein.

76.     When Defendants became aware of Mr. Andrews's disability during the course of the investigative process, they were under a duty pursuant to California law to engage in a timely, good faith, interactive process with him to determine an effective and reasonable accommodation for Mr. Andrews's continued employment with USBI.

77.     On or about December 16, 2019, rather than engage in an interactive process with Mr.

Andrew, USBI instead summarily terminated his employment with the company.

78.     As a result of Defendants' failure to engage Mr. Andrews in an interactive process, he has suffered lost income, benefits, and bonuses, as well as severe emotional distress, mental anguish and physical injury, all in sums according to proof at trial.

79.     Defendants' conduct was oppressive, malicious, and fraudulent, and Mr. Andrews is entitled to an award of punitive damages in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**

**Wrongful Termination in Violation of Public Policy**

**(Against All Defendants)**

80.     Plaintiff realleges and incorporates by reference paragraphs 1 through 79 as if fully alleged herein.

81.     The State of California's public policy is to prohibit discrimination by employers against employees on the basis of their disabilities.

82.     On or about December 16, 2019, Defendants violated California public policies by wrongfully terminating Mr. Andrews on the basis of disability, *i.e.*, Tourette's Syndrome; by failing to provide Mr. Andrews accommodation for his known disability; by failing to engage in an interactive process with Mr. Andrews; and by failing to prevent discrimination toward Mr. Andrews.

83.     As a result of Defendants' discriminatory termination of Mr. Andrews, he has suffered lost income, benefits, and bonuses, as well as severe emotional distress, mental anguish and physical injury, all in sums according to proof at trial.

84.     Defendants' conduct was oppressive, malicious, and fraudulent, and Mr. Andrews is entitled to an award of punitive damages in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**

**Violation of California Business and Professions Code Section 17200**

**(Against all Defendants)**

85.     Plaintiff realleges and incorporates by reference paragraphs 1 through 84 as if fully alleged herein.

86.     Defendants engaged in unlawful, unfair and fraudulent business acts or practices by

COMPLAINT FOR DAMAGES

15

terminating Mr. Andrews wrongfully and by violating anti-discrimination laws.

87. Plaintiff was financially harmed by Defendants' acts of unfair competition.

## SIXTH CAUSE OF ACTION

### Violation of California Labor Code Section 1198.5

### (Against USBI and DOES 1 to 10)

88. Plaintiff realleges and incorporates by reference paragraphs 1 through 87 as if fully alleged herein.

89. California Labor Code section 1198.5 provides that every former employee has the right to "receive a copy of the personnel records that the employer maintains relating to the employee's performance or to any grievance concerning the employee."

90. Mr. Andrews has requested from USBI information regarding its investigation and the allegations made against him, but USBI has failed to provide him with the requested documents and records.

91. As a result of USBI's failure to comply with its obligations under California Labor Code section 1198.5, Mr. Andrews is entitled to all penalties and injunctive relief statutorily afforded him.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Gregory J. Andrews prays for the following relief:

1. An Order of the Court declaring that Mr. Andrews was unlawfully terminated in violation of the anti-discrimination provisions of the California Fair Employment and Housing Act;

2. Money damages as permitted by law;

3. Penalties to the greatest extent allowed by law;

4. Preliminary and permanent injunctive relief as allowed by law, including an Order of the Court directing USBI to replace language on Mr. Andrews's publicly available FINRA record with the Court's declaration requested above;

5. Restitution and disgorgement, if appropriate;

6. Punitive damages against the Defendants on all claims to which he is entitled to such relief;

7.      Attorneys' fees and costs to the maximum extent permitted by law and contract;

8.      Front pay in lieu of reinstatement;

9.      All interest as allowed by law; and

10.     Any further relief the Court deems just and proper.

Dated: December 15, 2021                    Respectfully submitted,

                                            By:  /s/ Nathan M. Smith
                                            Nathan M. Smith (Ca. Bar No. 255212)
                                            **BROWN NERI SMITH & KHAN LLP**
                                            11601 Wilshire Boulevard, Suite 2080
                                            Los Angeles, California 90025
                                            Email: nate@bnsklaw.com
                                            Phone: 310-593-9890
                                            Fax: 310-593-9980

Dated: December 15, 2021                    By:  /s/ Andrew M. Purdy
                                            Andrew M. Purdy (CA Bar No. 261912)
                                            **ANDREW M. PURDY, ATTORNEY AT LAW**
                                            15615 Alton Parkway, Suite 450
                                            Irvine, CA 92618
                                            Email: amp@purdylegal.com
                                            Tel: (949) 570-55 00
                                            Fax: (949) 298-7234

Dated: December 15, 2021                    By: /s/ Liam O'Brien
                                            Liam O'Brien (*pro hac vice forthcoming*)
                                            **MCCORMICK & O'BRIEN, LLP**
                                            9 East 40th Street, Fourth Floor
                                            New York, NY 10016
                                            Email: lobrien@mcoblaw.com
                                            Tel: (212) 320-8972
                                            Fax: (212) 504-9574

                                            *Attorneys for Plaintiff*
                                            *Gregory J. Andrews*

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial for all claims so triable.

Dated: December 15, 2021                  Respectfully submitted,

                                          By:  /s/ Nathan M. Smith
                                          Nathan M. Smith (Ca. Bar No. 255212)
                                          **BROWN NERI SMITH & KHAN LLP**
                                          11601 Wilshire Boulevard, Suite 2080
                                          Los Angeles, California 90025
                                          Email: nate@bnsklaw.com
                                          Phone: 310-593-9890
                                          Fax: 310-593-9980

Dated: December 15, 2021                  By:  /s/ Andrew M. Purdy
                                          Andrew M. Purdy (CA Bar No. 261912)
                                          **ANDREW M. PURDY, ATTORNEY AT LAW**
                                          15615 Alton Parkway, Suite 450
                                          Irvine, CA 92618
                                          Email: amp@purdylegal.com
                                          Tel: (949) 570-55 00
                                          Fax: (949) 298-7234

Dated: December 15, 2021                  By: /s/ Liam O'Brien
                                          Liam O'Brien (*pro hac vice forthcoming*)
                                          **MCCORMICK & O'BRIEN, LLP**
                                          9 East 40th Street, Fourth Floor
                                          New York, NY 10016
                                          Email: lobrien@mcoblaw.com
                                          Tel: (212) 320-8972
                                          Fax: (212) 504-9574

                                          *Attorneys for Plaintiff*
                                          *Gregory J. Andrews*

Electronically Filed by Superior Court of California, County of Orange, 12/30/2021 11:23:00 PM.
30-2021-01236706-CU-OE-NJC - ROA # 12 - DAVID H. YAMASAKI, Clerk of the Court By efilinguser, Deputy Clerk.

| Attorney or Party without Attorney: | | For Court Use Only |
|---|---|---|
| Nathan M. Smith (CA Bar No. 255212)<br>BROWN, NERI, SMITH AND KHAN LLP<br>11601 Wilshire Blvd Suite 2080<br>Los Angeles, CA 90025<br>*Telephone No:* 310-593-9890 | | |
| *Attorney For:* Plaintiff | *Ref. No. or File No.:* | |

| Insert name of Court, and Judicial District and Branch Court: |
|---|
| SUPERIOR COURT OF THE STATE OF CALIFORNIA<br>COUNTY OF ORANGE - NORTH JUSTICE CENTER |

| *Plaintiff:* GREGORY J. ANDREWS, an individual,<br>*Defendant:* U.S. BANK NATIONAL ASSOCIATION, a Delaware corporation; et al. |
|---|

| PROOF OF SERVICE<br>SUMMONS | *Hearing Date:* | *Time:* | *Dept/Div:* | *Case Number:*<br>30-2021-01236706-CU-OE -NJC |
|---|---|---|---|---|

1. *At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the Summons; Complaint; Civil Case Cover Sheet; Notice Of Hearing Case Management Conference

3.   *a.*   *Party served:*     U.S. BANCORP INVESTMENTS, INC., a Delaware corporation
  *b.*   *Person served:*   Amy McLaren, The Corporation Trust Company, Registered Agent

4. *Address where the party was served:*   1209 Orange St, Wilmington, DE 19801

5. *I served the party:*
  a. **by personal service.**   I personally delivered the documents listed in item 2 to the party or person authorized to receive
         service of process for the party (1) on *(date)*: Mon, Dec 27 2021 (2) at *(time)*: 02:50 PM
  (1)   [X]   (business)
  (2)   [  ]   (home)
  (3)   [  ]   (other) :

6. The "Notice to the Person Served" (on the summons) was completed as follows:
  a.   [  ]   as an individual defendant.
  b.   [  ]   as the person sued under the fictitious name of *(specify)*:
  c.   [  ]   as occupant.
  d.   [X]   On behalf of *(specify)*:   U.S. BANCORP INVESTMENTS, INC., a Delaware corporation
        under the following Code of Civil Procedure section:

| | |
|---|---|
| [X] 416.10 (corporation) | [  ] 415.95 (business organization, form unknown) |
| [  ] 416.20 (defunct corporation) | [  ] 416.60 (minor) |
| [  ] 416.30 (joint stock company/association) | [  ] 416.70 (ward or conservatee) |
| [  ] 416.40 (association or partnership) | [  ] 416.90 (authorized person) |
| [  ] 416.50 (public entity) | [  ] 415.46 (occupant) |
| [  ] other: | |



Judicial Council Form POS-010<br>
Rule 2.150.(a)&(b) Rev January 1, 2007

**PROOF OF
SERVICE
SUMMONS**

*6497173*<br>
*(4851536)*<br>
Page 1 of 2

| Attorney or Party without Attorney: | | For Court Use Only |
|---|---|---|
| Nathan M. Smith (CA Bar No. 255212)<br>BROWN, NERI, SMITH AND KHAN LLP<br>11601 Wilshire Blvd Suite 2080<br>Los Angeles, CA 90025<br>Telephone No: 310-593-9890 | | |
| Attorney For: Plaintiff | Ref. No. or File No.: | |

| Insert name of Court, and Judicial District and Branch Court: |
|---|
| SUPERIOR COURT OF THE STATE OF CALIFORNIA<br>COUNTY OF ORANGE - NORTH JUSTICE CENTER |

| Plaintiff: GREGORY J. ANDREWS, an individual, |
|---|
| Defendant: U.S. BANK NATIONAL ASSOCIATION, a Delaware corporation; et al. |

| PROOF OF SERVICE<br>SUMMONS | Hearing Date: | Time: | Dept/Div: | Case Number:<br>30-2021-01236706-CU-OE -NJC |
|---|---|---|---|---|

Recoverable cost Per CCP 1033.5(a)(4)(B)

7. **Person who served papers**
   a. Name: John Garber
   b. Address: **FIRST LEGAL**
      1517 W. Beverly Blvd.
      LOS ANGELES, CA 90026
   c. Telephone number: (213) 250-1111
   d. The fee for service was: $323.25
   e. I am:
      (1) [X] not a registered California process server.
      (2) [ ] exempt from registration under Business and Professions Code section 22350(b).
      (3) [ ] a registered California process server:
         (i) [ ] owner [ ] employee [ ] independent contractor
         (ii) Registration No:
         (iii) County:

8. *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

12/27/2021
*(Date)*

John Garber

FL FIRST LEGAL

Judicial Council Form POS-010
Rule 2.150.(a)&(b) Rev January 1, 2007

PROOF OF
SERVICE
SUMMONS

6497173
(4851536)
Page 2 of 2

MC-025

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| **Andrews v. U.S. Bank National Association, et al.** | **30-2021-01236706-CU-OE-NJC** |

ATTACHMENT     SUM-100

*(This Attachment may be used with any Judicial Council form.)*

**The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:** Liam O'Brien, **MCCORMICK & O'BRIEN, LLP**, 9 East 40th Street, Fourth Floor, New York, NY 10016; (212) 320-8972**.**

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Page 1 of 1

*(Add pages as required)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. July 1, 2009]

**ATTACHMENT**
**to Judicial Council Form**

*www.courtinfo.ca.gov*

American LegalNet, Inc.
www.Forms*Workflow*.com