JOAN B. TUCKER FIFE (SBN: 144572)
jfife@winston.com
RACHEL A. D. BUSCH (SBN: 327939)
rbusch@winston.com
Winston & Strawn LLP
101 California Street
San Francisco, CA 94111
Telephone: (415) 591-1000
Facsimile: (415) 591-1400

EMILIE C. WOODHEAD (SBN: 240464)
ewoodhead@winston.com
Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543
Telephone: (213) 615-1700
Facsimile: (213) 615-1750

Attorneys for Defendants
U.S. BANK NATIONAL ASSOC. and
U.S. BANCORP INVESTMENTS INC.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

GREGORY J. ANDREWS, an individual,

Plaintiff,

vs.

U.S. BANK NATIONAL ASSOCIATION, et al.

Defendant.

**Case No. 8:22-cv-00117-DOC-DFM**

**DECLARATION OF JENNIFER STRADA IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

[Concurrently Filed With (1) Notice of Motion And Motion; (2) Statement of Uncontroverted Facts; and (3) [Proposed] Order]

Hearing Date: October 17, 2022
Time: 8:30 Am
Courtroom: 10 A
Complaint Filed: December 15, 2021
Trial Date: December 6, 2022

I, Jennifer Strada, declare:

1. I am an EEO workplace investigator for the Centralized Investigations Team at U.S. Bank and have been since approximately February 2019. Before joining the Centralized Investigations Team at U.S. Bank, I was an Employee Relations Consultant for U.S. Bank from November 2015 to February 2019. I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

2. As a CIT investigator, I report to the CIT leadership in Human Resources at U.S. Bank. I do not report to Rod Dolan, Jason Stamm, or anyone in the U.S. Bank's BOAS group or its Private Wealth Management business line.

3. On November 7, 2019, I was assigned as the investigator on CIT case number 2885. It was referred to CIT as a case of possible retaliation by Greg Andrews. At the time I was assigned my investigation on November 7, 2019, the only information I had was from the CIT Case Tracker. A true and correct copy of the information from the CIT Case Tracker is attached hereto as Exhibit A.

4. When I began my investigation into whether Mr. Andrews had retaliated, I did not know that Mr. Andrews had any medical condition (including tics or Tourette's Syndrome) or took any medication for tics or Tourette's Syndrome.

5. U.S. Bank's policy on retaliation is described in the U.S. Bank Code of Ethics and Business Conduct. A true and correct copy of the U.S. Bank Code of Ethics and Business Conduct in effect during my investigation is attached hereto as Exhibit B.

6. U.S. Bank has had a Workplace Respect Policy in place at all times from June 2017 until December 2019. A true and correct copy of the Workplace Respect Policy in effect during my investigation is attached hereto as Exhibit C.

7. I took contemporaneous notes of my interviews for my investigation—meaning I typed notes of what each of the witnesses said as I was interviewing them. I

believe my notes were correct, accurate, and a true representation of my interviews. These notes (the ones that are attached hereto as Exhibits D-I) were last edited before I finalized the investigation results. I did not share my underlying interview notes with anyone prior to Mr. Andrews's termination.

8. On November 12, 2019, I interviewed Edgars Gulbis as part of my investigation. A true and correct copy of these investigation interview notes is attached hereto as Exhibit D.

9. On November 13, 2019, I interviewed Ary Aptin as part of my investigation. A true and correct copy of these investigation notes is attached hereto as Exhibit E.

10. On November 14, 2019, I interviewed Rod Dolan as part of my investigation. A true and correct copy of these investigation interview notes is attached hereto as Exhibit F.

11. In the course of the CIT investigation, I gathered and reviewed documents, including the "Edgars and Ary's Schedules" email that Plaintiff sent to Rod Dolan on November 2, 2019.

12. On November 18, 2019, I interviewed Jason Stamm as part of my investigation. A true and correct copy of these investigation notes is attached hereto as Exhibit G.

13. On November 18, 2019, I interviewed Rochelle Ward as part of my investigation. A true and correct copy of these investigation notes is attached hereto as Exhibit H.

14. Near the end of my interview with Ms. Ward, she told me that Mr. Andrews had a "tick" where he hits his leg and can't sit too long. (*See* Exhibit H.) As background, a father of one of my childhood friends had Tourette's. He would, at times, involuntarily and quickly turn his head to the side and make a sound. This is what I understood the symptoms of Tourette's to be. Based on that prior experience

and Ms. Ward's description of Mr. Andrews's tics, I wondered whether Mr. Andrews had Tourette's and wrote "(Tourette's ?)" in my notes. This was speculation on my part and I never found out whether Mr. Andrews actually had Tourette's—or any other diagnosed medical condition, for that matter—before his termination. In my experience with Tourette's Syndrome, I understood it to have symptoms of involuntary and momentary tics. I did not connect my speculation that Mr. Andrews might have Tourette's or Ms. Ward's comment about Mr. Andrews's tics with the allegations of retaliation that I was investigating. In my mind, I was investigating voluntary actions (not an involuntary and momentary tic). Specifically, Mr. Aptin and Mr. Gulbis had reported voluntary behavior, including: scheduling an in-person meeting, confronting Mr. Gulbis for undermining him to Mr. Dolan, making specific statements in context, and using profanity in context.

15. I did not tell Debby Gabris, Rod Dolan, or anyone else that I had wondered whether Mr. Andrews might have Tourette's after talking with Rochelle Ward.

16. On November 22, 2019, I interviewed Mr. Andrews as part of my investigation. This was my first interaction with Mr. Andrews; I had never met him before. A true and correct copy of these contemporaneous investigation notes is attached hereto as Exhibit I.

17. When I interviewed Mr. Andrews, I asked him (among other things) about what he and Mr. Dolan discussed on October 29, 2019, whether they discussed concerns about his performance, and whether they discussed feedback from others. Mr. Andrews told me what they had discussed (and that it called into question his integrity), and then volunteered that "[t]his upset [him] so much that he couldn't sleep or didn't take his meds." When I later asked Mr. Andrews about the meeting on October 30, 2019, he did not raise his medication again or discuss a medical condition. I also asked Mr. Andrews at the end of if there was anything else that we

didn't discuss that might be relevant or help me better understand what occurred. Mr. Andrews told me a couple things in response—but did not mention his medication or his medical condition. He never mentioned Tourette's during this interview.

18. During my interview with Mr. Andrews, he told me several things that corroborated retaliation against Mr. Gulbis, including that he told Mr. Gulbis that he did not have the right to undermine his authority with Mr. Dolan, that is when he raised his voice at Mr. Gulbis, and that he felt like he needed to put his foot down.

19. I noted in my conversation with Mr. Andrews that he told me that he had the most projects out of all the BOAS Managing Directors and that he had worked every day but two days up until his vacation. Mr. Andrews did not tell me anything that made me think that he might be disabled, was having trouble doing his job, or might need an accommodation.

20. In my CIT investigation, I concluded that Mr. Andrews retaliated against Mr. Gulbis for raising concerns about Mr. Andrews to Mr. Dolan in violation of U.S. Bank's Code of Ethics. I prepared an investigation report with factual findings, a list of the persons interviewed, and a list of the documents and evidence reviewed—including Plaintiff's "Edgars and Ary's Schedule" email. I recommended termination. A true and correct copy of my investigation report is attached hereto as Ex. J.

21. The decision to terminate Mr. Andrews was made before December 16, 2019. On December 16, 2019, I merely updated the Central Investigations Team report to note that Mr. Andrews had been involuntarily terminated and to reflect that action.

22. On December 16, 2019, I had a phone call with Mr. Andrews, Ms. Gabris, and Mr. Dolan. I discussed my findings and that the CIT investigation had substantiated that Mr. Andrews had engaged in retaliation in violation of U.S. Bank policy. Mr. Andrews termination was communicated to him at that meeting. I do not recall Plaintiff asking for a leave of absence or using the term "disability" in this call.

23. The decision to terminate Mr. Andrews was made because the CIT investigation had substantiated that Mr. Andrews had engaged in retaliation against Mr. Gulbis for raising serious concerns to Mr. Dolan and, in so doing, violated U.S. Bank's Code of Ethics and Business Conduct. This decision did not involve any actual or perceived medical condition claimed by Mr. Andrews.

24. My conclusion substantiating that Mr. Andrews had engaged in retaliation and my recommendation that he be terminated had nothing to do with: Mr. Andrews mentioning medication; Mr. Andrews having tics and/or my wondering if he had Tourette's Syndrome; or any medical condition of Mr. Andrews. I did not take any of those things into account.

25. My decision to recommend termination of Mr. Andrews was because I had substantiated that Mr. Andrews had engaged in retaliation against Mr. Gulbis. Ms. Gabris' statement that she thought Mr. Andrews might have been trying to go out on stress leave prior to my investigation and that he had not gone on leave did not factor into my conclusion that Mr. Andrews had engaged in retaliation or my recommendation that he be terminated.

26. Mr. Andrews never informed me that he was disabled during his employment at U.S. Bank and I did not regard Mr. Andrews as disabled. Mr. Andrews never used the word disability in his conversations with me.

27. I did not know that Mr. Andrews had any history of a disability.

28. The fact that Mr. Andrews told me that he took medication did not make me think that Mr. Andrews was disabled. Medicine can be for many things. And the fact that someone takes medicine does not mean (to me) that the person is disabled.

29. I had no knowledge prior to Mr. Andrews's termination that he had or claimed to have a medical condition that affected any major life activity such as caring for himself, seeing, hearing, eating, walking, standing, sleeping, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating,

working, or interacting with others.

30. Mr. Andrews never informed me that he had any medical condition that interfered with his ability to work as a BOAS Managing Director during his employment at U.S. Bank.

31. Mr. Andrews never informed me that he was diagnosed with unspecified tic disorder or that he believed he had Tourette's Syndrome during his employment at U.S. Bank.

32. Mr. Andrews never mentioned Tourette's Syndrome during his interview with me.

33. I did not know from the outset of my investigation that Plaintiff purportedly had Tourette's Syndrome.

34. During his interview with me, Plaintiff did not tell me that Tourette's Syndrome or a tic disorder *caused* his behavior in the meeting with Mr. Gulbis and Mr. Aptin on October 30, 2019.

35. I never saw Mr. Andrews in person or on video and never saw any tics or movements. I only ever spoke to Mr. Andrews on the phone.

36. I never heard any vocal tics or involuntary vocalizations when I spoke to Mr. Andrews on November 22, 2019 or in the termination call on December 16, 2019—which are the only times I ever heard his voice. He spoke and sounded normal to me.

37. Mr. Andrews never informed me that he developed an issue with typing at any point during his employment at U.S. Bank or that he needed an accommodation.

38. Mr. Andrews never asked me for an accommodation before the termination decision was communicated to him. I never became aware that Mr. Andrews needed an accommodation during his employment.

I declare under the penalty of perjury of the laws of the State of California and the United States of America that the foregoing is true and correct and that this declaration was executed on September 19, 2022, at St. Louis, Missouri.

Jennifer Strada

Jennifer Strada